# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: March 23, 2020

```
* * * * * * * * * * * * * **
CHARLES PRESLEY,                    *        PUBLISHED
                                    *
                 Petitioner,        *        No. 17-1888V
                                    *
v.                                  *        Special Master Nora Beth Dorsey
                                    *
SECRETARY OF HEALTH                 *        Decision Awarding Damages;
AND HUMAN SERVICES,                 *        Pain and Suffering; Influenza ("Flu")
                                    *        Vaccine; Guillain-Barré Syndrome ("GBS").
                 Respondent.        *
                                    *
* * * * * * * * * * * * * **
```

Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
Robert P. Coleman, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

### I.    INTRODUCTION

On December 6, 2017, Charles Presley ("petitioner") filed a petition under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"),[2] 42 U.S.C. § 300aa-10 et seq. (2012).  Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on December 15, 2016.  Petition at 1.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

On April 8, 2019, respondent filed his Rule 4(c) Report in which he stated that he does not contest that petitioner is entitled to compensation in this case. Respondent's Report ("Resp. Rept.") at 1. Specifically, respondent states, "[t]he evidence shows that petitioner suffered GBS following the administration of an influenza vaccine, and that the onset of the condition occurred within the time period specified in the Table." Id. at 3. A Ruling on Entitlement was issued on April 12, 2019. Ruling on Entitlement (ECF No. 35). The parties subsequently asked the undersigned to issue an award on damages, with respect to certain disputed items.

For the reasons set forth below, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.

## II.   PROCEDURAL HISTORY

Mr. Presley filed his petition for compensation on December 6, 2017. (ECF No. 1). On December 18, 2017 he filed medical records and a Statement of Completion. (ECF Nos. 7-8). On March 26, 2018, petitioner filed his affidavit, an amended petition, and a status report. (ECF Nos. 11-13).

On September 4, 2018, respondent filed a status report stating that he was willing to engage in discussions regarding potential settlement. Resp. Status Rept., filed Sept. 4, 2018 (ECF No. 21). On October 9, 2018, petitioner filed a status report confirming he transmitted his demand to respondent. Petitioner's ("Pet.") Status Rept., filed Oct. 9, 2018 (ECF No. 23). On March 4, 2019, the petitioner filed a joint status report stating that "the parties have been unable to reach an informal resolution in the case." Joint Status Rept., filed Mar. 4, 2019 (ECF No. 31).

On April 8, 2019, respondent filed his Rule 4(c) Report stating that he does not contest entitlement in this matter. Resp. Rept. at 1. A Ruling on Entitlement in petitioner's favor and a damages order were issued on April 12, 2019. (ECF Nos. 35-36). A damages hearing was set for September 27, 2019. Pre-hearing Order dated July 15, 2019 (ECF No. 41). The parties filed their respective pre-hearing submissions from August 27 to September 25, 2019. (ECF Nos. 43-48).

The damages hearing was held as scheduled in Gainesville, Georgia, on September 27, 2019. Mr. Presley and Mr. Rupke, Mr. Presley's friend and neighbor, testified on behalf of petitioner.

On March 13, 2020, petitioner submitted a status report stating petitioner makes no claim for lost wages or unreimbursed expenses. Pet. Status Rept., filed Mar. 13, 2020 (ECF No. 53).

The damages award is now ripe for adjudication.

## III.   FACTUAL SUMMARY

Mr. Presley was a fifty-nine-year-old retiree at the time he received a flu vaccination at Georgia Mountains Health on December 15, 2016. Petition at ¶ 1. Prior to receiving the

vaccination in question, petitioner's medical history included type 2 diabetes mellitus complicated by diabetic neuropathy, diabetic arthropathy, and, in April 2015, a below-the-knee amputation of his left leg due to osteomyelitis and gangrene.  Petitioner's Exhibit ("Pet. Ex.") 2 at 44; Pet. Ex. 7 at 3, 22.

After his left leg was amputated in April 2015, petitioner suffered from symptoms of depression and feelings of hopelessness.  Pet. Ex. 2 at 40.  But by the end of that year, petitioner was adjusting to his amputation and was attending an amputee support group.  Id. at 36.  After his amputation, petitioner presented numerous times to nurse practitioner ("NP") Rene Guild, complaining of hand and foot paresthesia.  Id. at 33, 36, 40.  In June 2016, petitioner was watching his diet closely and had a new prosthetic leg.  Id. at 29.  He reported that he was doing better and that his depression was "pretty controlled."  Id. at 29-30.  By September 2016, petitioner felt great and was walking normally on his prosthesis without balance problems.  Id. at 26-28.

On December 15, 2016, petitioner presented to NP Guild for evaluation of his diabetes.  Pet. Ex. 2 at 23.  He stated he felt great and was dancing every day.  Id.  At this appointment, petitioner reported that his hand and foot symptoms had mostly subsided.  Id.  He received a flu vaccination.  Id. at 25.

On January 13, 2017, petitioner returned to NP Guild complaining that his hands felt shaky, numb, and had an electrical feeling.  Pet. Ex. 2 at 21.  Both his shoulders hurt.  Id.  NP Guild also noted that his arms and knees were weak.  Id.  Petitioner's legs were so weak he fell on multiple occasions.  Transcript ("Tr.") 6-7.  He knew something was wrong, so he began using his wheelchair to get around at home.  Id.  Then, on January 18, 2017, petitioner fell to the floor attempting to transfer himself from his bed into his wheelchair.  Tr. 7; Pet. Ex. 8 at ¶ 2.  Petitioner was alone and unable to get up off the floor for hours.  Tr. 7; Pet. Ex. 8 at ¶ 2.  It was not until a neighbor, Mr. John Rupke, came by petitioner's home and gazed through a window that petitioner was rescued.  Tr. 7, 45; Pet. Ex. 10 at ¶ 1.  Mr. Rupke called an ambulance that took Mr. Presley to the hospital.  Tr. 7, 46.

On January 18, 2017, petitioner arrived at the Piedmont HealthCare Emergency Department ("Piedmont") for onset of severe weakness in his arms and legs that began six days earlier.  Pet. Ex. 7 at 1006-08.  Petitioner arrived at the emergency department shortly before ten o'clock at night and was admitted for fall, increasing muscular weakness, abrasions to his right toe, and a urinary tract infection ("UTI").  Id. at 1005-06.  He denied any pain.  Id. at 1006.  The emergency department documented that Mr. Presley was "doing well walking using prosthesis until 6 days ago."  Id.  The hospital performed head and cervical spine MRI, chest X-rays, and labs.  Id. at 1008-11.  There were no available beds at the hospital, so petitioner stayed in the emergency department throughout the night and into the evening on January 19, 2017.  Id. at 1011-13.  Petitioner had a bed pending for admission at Piedmont Atlanta Hospital but transfer never occurred.  Id. at 1009, 1014.  Piedmont Atlanta Hospital was on diversion; thus, a bed was not available.  Id.  Circumstances are not entirely clear, but petitioner was discharged home instead of being admitted to the hospital or a rehabilitation facility.  Tr. 8; Pet. Ex. 10 at ¶ 5.

3

On discharge from Piedmont, petitioner was diagnosed with a contusion of the right foot, UTI, and upper extremity weakness. Pet. Ex. 7 at 1011. His urine analysis was positive for pseudomonas aeruginosa. Id. at 1013. His notes indicated his weakness was due to the UTI. Id. at 1014. Petitioner was also noted to be Medicaid only. Id. at 1015. Petitioner requested some assistance at home and the hospital made a referral for home health. Id. at 1016. However, hospital notes remarked that finding someone to take Medicaid was probably not possible. Id. A call placed on January 20, 2017, confirmed that petitioner did not have home health on his account. Pet. Ex. 4 at 80. On January 22, 2017, Registered Nurse ("RN") Josie Homas called petitioner advising him to return to the emergency department for treatment and evaluation, but petitioner stated he was feeling somewhat better and would return if he was worse. Pet. Ex. 7 at 1013-14.

Petitioner filed medical records from the Gentiva Home Health ("Gentiva") after discharge from Piedmont. See Pet. Ex. 4. Petitioner was referred to Gentiva for nursing care, physical therapy ("PT"), and nursing assistant care. Id. at 7. Home health care was instituted on January 24, 2017, regarding Mr. Presley's diagnosis of UTI, muscle weakness, and care of his right toe. Id. at 45. Skilled nursing was provided for UTI and fall risk. Id. at 46. PT was to evaluate for recent weakness and falls. Id. During the first visit, petitioner was noted to no longer be able to stand safely, was unable to drive, and had extreme fatigue. Id. at 47.[3] He was homebound and unsteady with a risk of falling. Id. at 45. Petitioner received assistance devices such as elevated toilet seat, grab bars, and a walker. Id.

On January 24, 2017, a comprehensive adult assessment for purpose of home health care certification was performed by RN Kari Allen. Pet. Ex. 4 at 96. The assessment was ordered due to his acute hospital visit where he was diagnosed with a UTI, generalized weakness, and a right toe wound. Id. at 97. He had urinary incontinence and was in fragile health with risk of serious complications. Id. at 98-99. Petitioner reported his pain was a 3/10 with aching all over, with pain worse at night. Id. at 101. He still had his toe injury. Id. at 102. He was unable to groom himself, and entirely dependent on another to dress. Id. at 107. He was unable to bathe independently or toilet without assistance. Id. at 107-08. He was unable to bear weight or transfer from bed to wheelchair without assistance. Id. at 108. He required the assistance of two caregivers to get into a vehicle and was unable to drive. Id. Additionally, he was unable to perform household duties including laundry, preparing meals, and grocery shopping. Id. at 109.

On January 27, 2017, petitioner returned to Piedmont for a dose of intravenous ("IV") antibiotics for his UTI. Pet. Ex. 7 at 1073. Petitioner received his first dose at the hospital and then reported he would continue the dosage at home with Gentiva. Id. He received a visit from Gentiva on January 28, 2017. Pet. Ex. 4 at 119. Petitioner was voiding without problems and was noted to have an IV in his right hand for antibiotics. Id. at 121, 123.

Immediately after discharge from Piedmont, and for the next twelve days, Mr. Rupke visited petitioner twice a day to feed him, clean him, and take care of what petitioner could no

---

[3] Circumstances of Gentiva following discharge from Piedmont are unclear due to lack of clarity in the medical records. See also Pet. Ex. 4 at 93 (regarding Dr. Pena's concerns about nursing care and compliance with his antibiotics order).

longer do for himself.  Pet. Ex. 10 at ¶ 5; Tr. 47-48.  On January 30, 2017, Mr. Rupke drove petitioner to the office of Dr. Saima Khurram, a neurologist, for his neurology appointment.  Pet. Ex. 10 at ¶ 6.  Dr. Khurram asked about petitioner's onset of his symptoms in January and took particular note of his receipt of a flu vaccination in December 2016.  Pet. Ex. 6 at 9; Tr. 10-11. Petitioner had upper and lower extremity weakness with reflexes absent at the right knee and ankle.  Pet. Ex. 6 at 10.  He reported that his symptoms were progressively getting worse and he had difficulty pulling himself out of his wheelchair.  Id. at 9.  Upon assessment, Dr. Khurram opined that petitioner could have GBS.  Id. at 9-10.  Dr. Khurram sent petitioner to Northside Hospital Emergency Room for an MRI of the thoracic spine with and without contrast and a lumbar puncture ("LP") to confirm the diagnosis.  Id. at 10.

From January 30, 2017 to February 6, 2017, petitioner was hospitalized at Northside Hospital.  See Pet. Ex. 3.  At the time of admission, petitioner was unable to lift his arms up over his head.  Id. at 11.  He had progressive weakness and had not been able to sit up or walk for three weeks.  Id. at 5.  He had been wheelchair bound since then.  Id. at 16.  Dr. Eduardo Morales documented symptoms occurring a month prior starting with bilateral shoulder pain with progressive numbness starting in the shoulders and then moving down to the hands.  Id. at 13. Dr. Morales noted that petitioner's lower extremities were also experiencing numbness and progressive weakness.  Id.  On January 30, 2017, petitioner underwent a LP[4] three separate times without success.  Id. at 7-8; Pet. Ex. 6 at 32; Tr. 11.  Petitioner was admitted and had IV fluid hydration before trying the LP again the next day.  Pet. Ex. 3 at 9.  The following day two more LPs were attempted and were unsuccessful.  Id. at 210.  On February 2, 2017, multiple LPs were again unsuccessful.  Id. at 24.  Eventually that same day, doctors performed a LP through a cervical approach to obtain cerebrospinal fluid.  Id. at 38, 199; Tr. 11.

Cerebrospinal fluid analysis showed elevated protein and normal white blood cell levels. Pet. Ex. 3 at 22, 193.  Petitioner was diagnosed with possible GBS and started on a four-day course of IVIG treatment.  Pet. Ex. 6 at 16; Tr. 12.  Mr. Presley's symptoms improved after the IVIG treatment and at the time of discharge he was much stronger.  Pet. Ex. 3 at 11.  The hospital discharged petitioner on February 6, 2017, with instructions to follow up with his doctors and continue outpatient care for his UTI and physical therapy.  Id.

Petitioner requested home health care again on February 7, 2017 for his diagnosis of GBS and urinary incontinence.  Pet. Ex. 4 at 52, 132.  He received skilled nursing once per week and PT weekly to evaluate and treat his recent onset generalized weakness.  Id.  Petitioner also received IV antibiotics daily for ten days.  Id. at 57.  Petitioner required assistance with transfer from sitting to standing and transfer in and out of his wheelchair.  Id.  His pain rating remained 3/10 with intermittent aching.  Id. at 136.  His right toe wound was noted, and he was unable to walk.  Id. at 137-38.  He was assessed with increased muscle weakness and poor endurance.  Id.

---

[4] A lumbar puncture, colloquially known as a "spinal tap," is a test performed by placing a needle in the subarachnoid space of the spinal column to measure the pressure in that space and to obtain cerebrospinal fluid for examination and diagnosis.  Mosby's Manual of Diagnostic and Laboratory Tests, Chapter 5: Fluid Analysis Studies, Lumbar Puncture and Cerebrospinal Fluid Examination 589 (6th ed. 2018).

at 143.  He was able to bathe, but required supervision and assistance of another person for toileting.  Id. at 144.  He continued to depend on others for activities of daily living.  Id. at 147.

On February 16, 2017, a PT therapist noted that petitioner was walking in the kitchen where he could hold onto the counter.  Pet. Ex. 4 at 154.  On February 17, 2017, Amedisys Northwest Home Health ("Amedisys") dispatched a skilled nurse to assess petitioner's UTI and other conditions and assess risk for falls.[5]  Pet. Ex. 5 at 21.  During the first visit, the nurse noted the petitioner was "chairfast" and his ability to walk was severely limited.  Id. at 43.  Due to his UTI, a PICC line[6] was placed in his right arm to deliver antibiotics for another ten days.  Id. at 51; Pet. Ex. 7 at 1088.  The nurse also noted, "[p]atient is homebound due to generalized weakness related to diagnosis of Guillain Barre syndrome and difficulty ambulating due to L BKA [left below the knee amputation]."  Pet. Ex. 5 at 51.

Amedisys skilled nurses visited petitioner eight times from February 17 to April 3, 2017.  Pet. Ex. 5 at 21-95.  On February 21, 2017, a PT therapist noted that petitioner needed assistance to groom, dress, bathe, toilet, and was confined to his wheelchair.  Pet. Ex. 4 at 164-66.  On February 27, 2017, he was noted to have an unsteady gait, and remained weak and unable to leave home.  Pet. Ex. 5 at 58-59.  On March 6, the RN noted petitioner remained homebound due to the left lower leg amputation with residual weakness secondary to GBS.  Id. at 71.  On April 3, an Amedisys nurse assessed that petitioner was able to groom himself unaided, able to get dressed without assistance, and able to practice normal hygiene routines without assistance.  Id. at 93-95.  During this assessment, petitioner requested discharge stating he was no longer homebound and would follow up with his doctors when needed.  Id. at 96.

Petitioner followed up with Dr. Khurram on February 21, 2017.  Pet. Ex. 6 at 5.  Petitioner had mild depression, but was showing improvement in his GBS symptoms.  Id.  Dr. Khurram noted petitioner was able to stand with assistance but could not walk long distances and still required a wheelchair.  Id. at 6.  On examination, he had continued to have lower extremity weakness and absent patellar deep tendon reflexes.  Id.

During a follow up for petitioner's UTI, GBS, and other conditions on March 15, 2017, NP Guild noted that petitioner's neurologist had seen petitioner and found petitioner's GBS resolved with no need for further follow up.  Pet. Ex. 2 at 13.  However, Dr. Khurram's neurology notes do not indicate that petitioner was GBS "free."  See Pet. Ex. 6.

On May 30, 2017, petitioner sought care at Piedmont because of cellulitis in his left stump.  Pet. Ex. 7 at 1108.  He stated he experienced pain and swelling due to wearing his prothesis the day prior when he had turned the wrong way and pulled his leg.  Id. at 1105.  He was noted to have a history of GBS.  Id. at 1131.  The hospital gave him IV antibiotics and discharged him home.  Id. at 1108.

---

[5] The reason why petitioner changed home health providers is unclear.

[6] "PICC" stands for peripherally inserted central catheter.  Dorland's Illustrated Medical Dictionary 1424 (33rd ed. 2020).

On June 5, 2017, petitioner followed up with NP Guild for the infection on his stump. Pet. Ex. 2 at 4-5. On June 15, 2017, he returned to NP Guild because his stump infection. Id. at 1. He was wheelchair bound because his leg was too sore to wear his prosthesis. Id. at 2. NP Guild issued more antibiotics. Id. at 3.

On September 26, 2017, petitioner presented to NP Guild for evaluation of his type 2 diabetes and obesity. Pet. Ex. 2 at 152. At his appointment, petitioner complained of weak arms while trying to do pushups and he was dropping things. Id. He also reported he had been sleepwalking and fell, so had to tie himself to his bed for safety. Id. There were no further references in the medical records related to GBS until November 1, 2017, when petitioner presented to his neurologist with complaints of numbness in his hands. Pet. Ex. 6 at 56-57.

On November 1, 2017, petitioner expressed his concern to Dr. Khurram that GBS caused his erectile dysfunction. Pet. Ex. 6 at 56-57. He was still having numbness in his hands, sleep walking, and having frequent falls. Id. On examination, petitioner had pinprick sensations decreased in the right leg above the knee, normal upper extremity strength, and absent patellar deep tendon reflexes. Id. Dr. Khurram noted that petitioner could stand with assistance and use his wheelchair for long distances but was concerned with his sleepwalking and neuropathy. Id. at 57.

## IV.   TESTIMONY AT DAMAGES HEARING

Two fact witnesses testified at the damages hearing: Mr. Presley and his friend, Mr. John Rupke.

### A.  Petitioner

Mr. Presley's testimony took up the majority of the damages hearing. See Tr. at 6-42; see also Affidavit, dated Feb. 2, 2018, filed as Pet. Ex. 8 (ECF No. 11); Supplemental Affidavit, dated Aug. 27, 2019, filed as Pet. Ex. 11 (ECF No. 43). He described both the nature of his GBS and the ongoing sequalae.

Mr. Presley began by explaining when he first noticed the symptoms of his GBS. At first, he noticed pain and weakness in his shoulders, but soon he started losing muscle control and began falling. Tr. 6. He had recently re-learned to walk using his prosthesis, but decided it was best to rely on his wheelchair again. Tr. 7. On January 18, 2017, when petitioner attempted to transfer himself from his bed to his wheelchair, he suddenly lost all strength. Id. He fell to the floor with little to no mobility in his limbs. Id. When he fell, his foot caught in his wheelchair and gouged his right toe. Id. He remained there for hours until his neighbor, Mr. John Rupke, looked into his bedroom window and found him. Id. Mr. Rupke called an ambulance. Id.

Mr. Presley arrived at Piedmont where he had a MRI, X-rays, and labs. Pet. Ex. 7 at 1008-11; Tr. 8. Petitioner waited on a stretcher in the hallway of the emergency department for hours for a room, a hospital bed, or to be transferred to a different facility. Tr. 8; Pet. Ex. 8 at ¶ 3. After almost twenty-four hours of waiting with no discernable diagnosis, the hospital staff

discharged Mr. Presley.  Tr. 8; Pet. Ex. 8 at ¶ 3.  At that point in his illness, Mr. Presley contemplated suicide.  Pet. Ex. 8 at ¶ 3.

Mr. Presley arranged for a ride home, was wheeled into his house, and placed into bed. Tr. 8.  At some point during the night, unable to control his body, Mr. Presley rolled out of bed and onto the floor.  Tr. 9.  This time he was able to call 911 and the fire department came.  Id.; Pet. Ex. 8 at ¶ 4.  After placing Mr. Presley back into his bed, the fire fighters attempted to convince Mr. Presley to go to the hospital.  Tr. 9.  He explained he had just come from there and they could do nothing for him.  Id.; Pet. Ex. 8 at ¶ 4.  The fire department left, and petitioner remained immobile in bed for the next few days.  Tr. 9; Pet. Ex. 8 at ¶ 4.

Petitioner lives alone on a mountain approximately 2,000 feet up.  Tr. 19.  Primary access to his cabin is from a steep gravel road that curves up the mountainside.  Id.  There are only a few houses scattered along the road.  Tr. 44.  Unable to move, and without any support system, petitioner laid in bed.  Tr. 9.  If not for his friend Mr. Rupke, petitioner testified he felt he would have died.  Id.; Pet. Ex. 8 at ¶ 3.

About a week later, Mr. Rupke drove petitioner to his neurologist appointment and from there he was admitted into Northside Hospital.  Tr. 10-11.  Mr. Presley reports that when he arrived at the hospital, he endured nine attempts of a lumbar puncture.  Tr. 11; Pet. Ex. 8 at ¶ 6. He testified, it was "absolutely terrifying."  Tr. 11.

Petitioner received IVIG treatment for at least four hours every day.  Tr. 12.  For days he contemplated that he might never walk again or be able to use his hands in the same way.  Id.  To eat, petitioner's hands were taped around large foam fork handles.  Id.  He remembered how denigrated and horrible he felt trying to scoop food into his mouth.  Id.  The fear and anxiety that his amputation had once engendered bubbled back to the surface.  Tr. 13.  He had just learned to walk and now he was wheelchair bound once again.  Id.  He was afraid he would never walk again.  Tr. 12.

The doctors suggested he go to a nursing facility after discharge, but petitioner's Medicaid status limited his options.  Tr. 13.  After the difficulty at Piedmont on January 18, then the trouble of finding a neurologist that would treat him, and now his limited options of nursing assistance, petitioner felt discriminated against.  Tr. 14; Pet. Ex. 8 at ¶ 3, 5.  He reported that because of his Medicaid, Northside Hospital told him he had to go.  Tr. 14.  His clinical course was done and there was no room for him.  Id.  No other hospitals in Atlanta could take him.  Id. Mr. Presley felt "kicked to the curb."  Id.  He found himself again on a stretcher in a hospital hallway waiting.  Id.  He recalled being scared to death.  Id.

During testimony, petitioner recounted how, years ago, one of his best friends, Greg, fell down a flight of stairs and became quadriplegic.  Tr. 28.  Greg, like himself, had no family and it fell to Mr. Presley and other friends to take care of him.  Id.  Mr. Presley called those two years of his life "hell" and when his best friend died, he was relieved.  Id.  As Mr. Presley sat in the hospital hallway, he thought, "I'm going to be just like Greg, and I'm probably going to not survive it."  Id.

After Mr. Presley returned home from Northside Hospital, he was completely reliant on Mr. Rupke. Tr. 15. Mr. Rupke made food for Mr. Presley, bought groceries, fed his cats, and helped dress and clean Mr. Presley. Tr. 15-16. Mr. Presley stated he was utterly helpless. Tr. 16. Besides Mr. Rupke's twice daily visits, Mr. Presley was alone. Tr. 16-17. Though a few weeks after his discharge from the hospital, physical therapists came to his house to teach him how to walk again. Tr. 17; Pet. Ex. 5 at 21. While he began to recover, Mr. Presley could use his arms and legs again, but anything detailed like buttoning a shirt or tying a tie was difficult. Tr. 34, 36.

Currently, petitioner feels that his GBS impacted all areas of his life. The muscle weakness in his shoulders and hands is unchanged since January 2017. Tr. 35. He suffers from erectile dysfunction that began after the GBS onset. Tr. 19; Pet. Ex. 11 at ¶ 2. He loved to work with intricate pottery but can no longer grasp the tools or be precise due to numbness in his fingertips. Tr. 19; Pet. Ex. 8 at ¶ 7. Cooking, a favorite pastime, poses the same challenges—he cannot grasp knives firmly and fears dropping them. Tr. 21-22. He also loved to dance. Tr. 21. He was inspired by other people who lost limbs and continued to be active, but now he can no longer dance like he used to. Id.; Pet. Ex. 11 at ¶ 3. He believes his symptoms are permanent. Tr. 25.

Sleeping is its own endeavor. He sleeps strapped to his bed, so he never has to fear rolling out and onto the floor again. Tr. 21. Driving also poses many difficulties. His hands and forearms go numb when he drives long distances. Tr. 19; Pet. Ex. 11 at ¶ 3. Everyday tasks become potentially dangerous challenges. Tr. 19. For him, going to the grocery store or doctors' appointments means navigating a mountain road. Id.

At the hearing, Mr. Presley recounted how he used to work in information technology for CNN in Atlanta. He worked there for twenty years before Time Warner bought the company and laid off many of the employees. Tr. 41. He then ended up at an electric bicycle shop assembling bikes. Tr. 36; Pet. Ex. 11 at ¶ 3. He loved working there but left when he had his lower leg amputated. Tr. 41.

Recently Mr. Presley lost his Medicaid coverage. Tr. 22. When he turned sixty-two, he was put on early retirement Social Security, but that switch somehow cost him his insurance. Id.; Pet. Ex. 11 at ¶ 4. He now pays for all medical costs out of pocket. Tr. 26; Pet. Ex. 11 at ¶ 4.

**B. John Rupke**

Petitioner's second witness was his friend and neighbor, Mr. Rupke. See Tr. 43-58. He testified at the hearing and submitted one witness affidavit describing how he found and cared for Mr. Presley in 2017. See Affidavit, dated Aug. 27, 2019, filed as Pet. Ex. 10 (ECF No. 48).

Mr. Rupke is a retired attorney and was an EMT for fifteen years. Tr. 43, 46. He testified he is neighbors with Mr. Presley and lives at the bottom of the mountain. Tr. 43. Mr. Rupke called where they live "billy goat heaven" because of the rugged terrain and isolation between cabins. Tr. 44.

Mr. Rupke first met Mr. Presley at the post-office and since then they would get lunch together when Mr. Rupke was in town.  Tr. 53-54.  Mr. Rupke recalled Mr. Presley's devilish sense of humor.  Tr. 54.  Mr. Rupke noted that after Mr. Presley fell ill, he became very depressed and embarrassed at his situation.  Tr. 50.  He stated that after a year, Mr. Presley "was still not the old Thom I knew."  Pet. Ex. 10 at ¶ 7.

Mr. Rupke then described how he first learned of Mr. Presley's illness.  Mr. Rupke and his family only live in their Georgia mountain cabin for a few months out of the year.  Tr. 44; Pet. Ex. 10 at ¶ 2.  Whenever Mr. Rupke comes to town, he sends Mr. Presley an email.  Tr. 44.  When Mr. Presley did not answer his email or his phone in January 2017, Mr. Rupke went to his cabin to check on him.  Tr. 44-45; Pet. Ex. 10 at ¶ 3.  Mr. Rupke knocked on the door and began looking around when he looked through Mr. Presley's bedroom window and saw him lying on the floor.  Tr. 45.

Mr. Rupke stood outside the door of the cabin and watched Mr. Presley drag himself across the floor to let him in.  Tr. 45; Pet. Ex. 10 at ¶ 4.  It took several minutes for Mr. Presley to go a few feet.  Tr. 45.  Mr. Rupke then called an ambulance.  Tr. 46.

The next day, Mr. Presley called Mr. Rupke to come to his cabin.  Tr. 47.  Mr. Rupke made Mr. Presley a sandwich and fed his cats.  Id.  He also went out and got groceries.  Id.  Mr. Presley was unable to move from bed for the next several days.  Tr. 48.  During that time Mr. Rupke took total care of Mr. Presley: He cleaned up his waste, changed his bedsheets, and did what he could for his friend.  Tr. 48; Pet. Ex. 10 at ¶ 5.

Mr. Rupke now believes Mr. Presley has recovered but is not "quite the way he used to be."  Tr. 52; Pet. Ex. 10 at ¶ 7.  Mr. Rupke remembered Mr. Presley as "devastated" after his diagnosis and at one point wished he was dead.  Tr. 52-53.

## V.   CONTENTIONS OF THE PARTIES

On April 8, 2019, respondent conceded that petitioner was entitled to compensation. Resp. Rept. at 1.  From early September 2018 through early March 2019, the parties engaged in settlement discussions, but were unable to agree upon an amount.  Joint Status Rept., filed Mar. 4, 2019 (ECF No. 31).  Thus, the issue before the undersigned is the amount of damages to be awarded for Mr. Presley's pain and suffering and emotional distress.

### A.  Petitioner's Position

Petitioner proposes an award of $225,000.00 in past pain and suffering, $5,000.00 per year in future pain and suffering, and satisfaction of his Medicaid lien.[7]  Petitioner's Pre-hearing Brief ("Pet. Brief"), filed Sept. 17, 2019, at 5 (ECF No. 47).  Petitioner explains that the most difficult portion of his pain and suffering occurred within the first year following his vaccination, but that he continues to suffer from physical and mental anguish due to his GBS.  Id. at 7-8.  Mr.

---

[7] The Medicaid lien amounts to $49,812.78.  See Pet. Ex. 14.

Presley continues to experience numbness in his hands and foot, and weakness in his arms, shoulders, and lower extremities.  Id.  Petitioner was a very active person before his vaccine injury and has had to give up the things he once enjoyed such as driving, dancing, and cooking for himself.  Id. at 8-9.  Mr. Presley also described his agonizing hospitalization where he endured a four-day course of IVIG treatment and multiple failed lumbar puncture attempts.  Id. at 9.  Finally, he relates that there has been no improvement in his weakness and numbness in three years, and has no hope for a full recovery.  Id.

Petitioner also lives by himself and bears his illness alone.  Pet. Brief at 10.  Petitioner was recommended for a skilled nursing facility, but instead was sent home alone with minimal care.  Id.  Petitioner was homebound for three months and confined to his bed, his wheelchair, and to his cabin which caused him immense amounts of emotional and cognitive stress and depression.  Id.; Pet. Ex. 5 at 28.

In his brief, petitioner also cites two cases where petitioners received pain and suffering awards of $200,000.00[8] and $225,000.00.[9]  Pet. Brief at 12.  Both of these decisions were based on proffers, however, neither decision includes any information about the petitioners' clinical courses or factors that were considered in reaching the proffers.  The clinical course of GBS can be mild to severe.  A mild clinical course requires minimal hospitalization, however, GBS on the severe end may require intubation and ventilation, or result in significant complications, which require lengthy hospitalization and rehabilitation.  Thus, without knowledge of the facts underlying these awards, it is not possible to assess their relevance to Mr. Presley's case.

### B.  Respondent's Position

Respondent considers $130,000.00 to be an appropriate pain and suffering award.  Respondent's Pre-hearing Brief ("Resp. Brief"), filed Sept. 13, 2019, at 13 (ECF No. 46).  In his brief, respondent recognizes that GBS cases "have historically run the spectrum from cases involving severe sequelae requiring life care plans to assess prospective damages, to cases in which the petitioner nearly or completely recovers shortly after the six-month minimum duration of symptomatology required to qualify for compensation."  Id. at 12.  Respondent contends that petitioner's "clinical course documented by his medical records demonstrates a less severe course of GBS than others."  Id.

Respondent raises the fact that petitioner's in-patient hospitalization was limited to roughly one week, whereas some GBS patients require hospitalization for weeks or months.  Resp. Brief at 12.  Respondent likewise notes, while some patients with GBS remain dependent on wheelchairs, walkers, or canes, petitioner (despite having lost his left leg below the knee prior to receiving the vaccination in question), was able to stand independently approximately five

---

[8] Chatriand v. Sec'y of Health & Human Servs., No. 17-871V, 2018 WL 5262719 (Fed. Cl. Spec. Mstr. Aug. 20, 2018).

[9] Wiggins v. Sec'y of Health & Human Servs., No. 17-646V, 2018 WL 4390970 (Fed. Cl. Spec. Mstr. May 10, 2018).

weeks after he was hospitalized, and less than one month later he was noted to be "Guillon-Barre [sic] free" by his neurologist.[10]  Pet. Ex. 6 at 5; Pet. Ex. 2 at 13; Resp. Brief at 12.

Respondent also discusses that after petitioner's visit to his neurologist in March 2017, it was not until November 2017, ten months after vaccination and approximately seven months after being declared GBS free, that petitioner complained to a medical provider of numbness in his hands and some lower body weakness.  Pet. Ex. 6 at 56.  Respondent concludes that based on the objective record, petitioner's GBS and resulting sequelae are quite mild when compared to other GBS claims.  Resp. Brief at 12.

Respondent did not address petitioner's request for future pain and suffering damages.

## VI.    DISCUSSION AND ANALYSIS

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  See I.D. v. Sec'y of Health & Human Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), originally issued Apr. 19, 2013 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Human Servs., No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("The assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  See I.D., 2013 WL 2448125, at *9; McAllister v. Sec'y of Health & Human Servs., No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000."  § 15(a)(4).  In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering.  See I.D., 2013 WL 2448125, at *9-11, citing McAllister, 1993 WL 777030, at *3.  In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

### A.    Determining Petitioner's Award in This Case

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

---

[10] The reference to being GBS "free" is found in petitioner's primary care records, not in the neurologist's records.  The neurologist's records (Dr. Khurram) do not ever state that petitioner was GBS "free."  In fact, at petitioner's visit on February 21, 2017, Dr. Khurram noted lower extremity weakness and absent patellar deep tendon reflexes.  Pet. Ex. 6 at 5.  At that time, petitioner was still using a wheelchair when needed for long distances.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving GBS. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute. Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of his suffering.

Mr. Presley lives alone in a very isolated and mountainous area in Georgia without family. After his below the knee amputation he rebounded from depression and learned how to walk again. Then, due to the progressive onset of weakness, Mr. Presley fell to the floor and had no strength to pull himself up to his bed or wheelchair. Both Mr. Presley and Mr. Rupke delivered credible testimony that Mr. Presley was there for hours. After he was found, Mr. Presley's first visit to the emergency department entailed twenty-four hours of waiting and tests that yielded no diagnosis. No other hospitals could take Mr. Presley and he was discharged home. Tr. 8. Both Mr. Rupke and Mr. Presley stated that Mr. Presley began to contemplate suicide.

For the next twelve days, Mr. Rupke became Mr. Presley's primary care giver. Mr. Rupke shopped for and prepared food for Mr. Presley. He cleaned up his bed and his body when he was unable to make it to the bathroom. Mr. Presley was alone except for twice a day for a week and a half when Mr. Rupke came and tried to take care of him and when skilled nurses came twice. Mr. Presley's body ached, and he reported mild pain that grew worse at night. In their affidavits and during their testimonies, both Mr. Rupke and Mr. Presley gave vague outlines of what transpired during the times after Mr. Presley was discharged first from Piedmont and then Northside Hospital. However, it is clear the events were embarrassing and traumatic.

Mr. Presley was then hospitalized for approximately eight days for his GBS. During this time, he received multiple failed lumbar punctures which caused him immense pain and discomfort. He also received four days of IVIG therapy, which improved his symptoms. He was left with residual symptoms that rendered him unable to drive for approximately four months or participate in any of his usual activities for a considerable time. Prior to his GBS, he was fully independent and could drive when needed to go to doctors' appointments or the grocery store.

At home, Mr. Presley again faced isolation with the exception of Mr. Rupke's visits— until Mr. Rupke returned to Wisconsin with his family at the end of February—and the weekly visits of physical therapy and skilled nursing. See Pet. Ex. 10 at ¶ 1. During February and March, Mr. Presley slowly regained the strength to groom himself, and bathe and toilet without assistance. Though, for the first weeks after his diagnosis, he was unable to even transfer himself from his bed to his wheelchair or transition from sitting to standing. Then, he slowly learned to walk again and adjusted to his new reality. He still had mild pain that he described as aching in his shoulders and body, but began to deny pain to his Amedisys providers beginning in March. Pet. Ex. 5 at 70. After nine home sessions of PT and nursing care, that ended in April 2017, he could adequately care for himself and was no longer homebound. For roughly four months, Mr. Presley was entirely dependent on others for care and survival.

Throughout his recovery, petitioner received several rounds of IV antibiotics for a UTI and an infection of his stump that necessitated him to remain wheelchair bound.  He was also taking a number of medications for urinary retention, steroids, diabetes medication, and antidepressants.  His lower left leg amputation and preexisting diabetes exacerbated his condition and his need for a myriad of medications.  After his amputation in 2014, he dealt with severe feelings of depression and hopelessness he began to master with healthy diet and exercise.  But the GBS set him back.  He had re-learned to walk and dealt with depression two years prior to his GBS and then once again faced the challenge of being wheelchair bound with thoughts of suicide.

His progressive recovery in light of his amputation and diabetes does not in any way negate the seriousness and severity of his injury or the physical, mental, and emotional distress he endured during that time.  The undersigned recognizes the fact that his course of GBS was complicated by his prior below the knee amputation and lack of family support.

In terms of duration, the undersigned notes that Mr. Presley has been dealing with the residual symptoms of his GBS for nearly three-and-a-half years.  He also has muscle weakness where he tires very quickly.  The weakness extends to his forearms and hands, which makes driving on the winding mountainous road to and from his home dangerous.  Intricate work or use of his hands is almost impossible for him as well.  The numbness in his fingers make it difficult to be precise.  Thus, he can no longer do his favorite style of pottery or cook like he used to.  Even everyday tasks such as buttoning his shirts, tying a tie, and separating currency or papers are taxing for Mr. Presley.  Tr. 40.

## B.  Comparison to Other GBS Awards

Given the evidence provided in this case, the severity and duration of Mr. Presley's pain and suffering is most similar to that suffered by the petitioner in Johnson v. Secretary of Health and Human Services, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018).  There, petitioner Debra Johnson received the flu vaccine and approximately twenty-three days later was diagnosed with GBS.  Id. at *2.  Ms. Johnson worked as a school bus driver for her local school district and as a part-time school librarian.  Id.  After she received the flu vaccination in November 2015, she began to experience numbness in her hands and feet.  Id.  She was then hospitalized for five days and received five days of IVIG treatment.  Id. at *3.  She also underwent a lumbar puncture.  Id.  Ms. Johnson was able to walk with assistance three months after her hospitalization but could still not drive and therefore could not return to work— though she was allowed to return to work at the school library for half a day twice a week.  Id.  By the end of March 2016, approximately three-and-a-half months after her diagnosis, Ms. Johnson was cautiously driving again and walking without her walking sticks.  Id. at *4.  Subsequently, Ms. Johnson passed her physical examination in 2016 and returned as the school bus driver for the 2016-2017 school year.  Id.  She also returned part-time as the school librarian.  Id.

Ms. Johnson also had a total of 45 PT visits.  Johnson, 2018 WL 5024012, at *4.  She stated at her damages hearing that she can no longer take family hikes with her dog like they used to.  Id.  Ms. Johnson lived in a rural area in Maine and prior to her GBS she was fully

independent.  Id. at *7.  She also testified that as one of the residual symptoms of her GBS she was unable to tell when she needed to use the bathroom and traveled with spare clothing.  Id. at *5.  Finally, Ms. Johnson testified that she still had numbness in her legs and could not tell when her feet were cold.  Id.  Based on the facts and circumstances of the case, Ms. Johnson was awarded $180,000.00 for actual pain and suffering.  Id. at *9.

Additionally, the case Dillenbeck v. Secretary of Health and Human Services, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), remanded on other grounds, is illustrative.  Petitioner, Gayle Dillenbeck, received $170,000.00 in actual pain and suffering after her diagnosis of GBS following a flu vaccination.  Id. at *14.  Ms. Dillenbeck was hospitalized for two weeks and had multiple rounds of IVIG therapy.  Id. at *3.  Prior to the flu shot, Ms. Dillenbeck was generally healthy and participated in a number of outdoor activities including hiking and walking with her dogs.  Id.  However, due to GBS, she could no longer complete the long walks she was accustomed to and often experienced generalized fatigue and tiredness.  Id. at *4.

Also, due to her GBS, Ms. Dillenbeck was out of work for approximately four months.  Dillenbeck, 2019 WL 4072069, at *2.  During that time, she required live-in care from three family members who helped care for her animals and completed household tasks.  Id. at *3.  Ms. Dillenbeck took eight Gabapentin pills per day due to pain.  Id.  Due to the persistent pain she had trouble sleeping.  Id.  She attended outpatient PT two to three times per week.  Id.  Ms. Dillenbeck had numerous falls even while using her walker.  Id.

Mr. Presley's acute care needs were similar to Ms. Johnson.  Like, Ms. Johnson, Mr. Presley lives in an isolated area and was fully independent prior to the onset of GBS.  He was hospitalized three days longer than Ms. Johnson, but received one less day of IVIG therapy.  Mr. Presley's numerous failed lumbar punctures were a severe consequence of his hospital stay that Ms. Johnson did not have to endure.  They were unable to drive for approximately four months, which created issues for both.  Ms. Johnson's professional career depended on her ability to drive, and while Mr. Presley did not work, his living arrangements necessitated him to drive to the grocery store or to doctors' appointments by navigating a mountainous road.  Ms. Johnson attended forty-five PT sessions, whereas Mr. Presley was limited to nine sessions.  Mr. Presley's fragile state of health and left lower leg amputation precipitated a number of falls and chairfast status, but Ms. Johnson was able to walk using walking sticks within three months.

Mr. Presley's home condition was similar to Ms. Dillenbeck's.  They both required family or friends to help perform household chores.  Ms. Dillenbeck had three family members to attend to her, whereas Mr. Presley had no family and only a neighbor who came intermittently throughout the day to clean Mr. Presley and prepare food, as well as perform household chores.  Ms. Dillenbeck, however, had more severe pain than Mr. Presley and was hospitalized for two weeks, instead of eight days, and had multiple rounds of IVIG.  They both had trouble sleeping and fell multiple times during their progressive recoveries.

Like Ms. Dillenbeck and Ms. Johnson, Mr. Presley's previous pastimes are difficult, if not impossible, to enjoy.  Ms. Dillenbeck and Ms. Johnson enjoyed long walks they can no longer do due to fatigue and muscle weakness.  Mr. Presley was managing walking with his

prosthesis, but he really loved to dance.  After almost four years, Mr. Presley still cannot dance.  Additionally, while Ms. Johnson drives everyday for her job, Mr. Presley also drives, but not for long distances.

### C.  Petitioner's Pain and Suffering

For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.

The undersigned notes that this award is less than the amount requested by petitioner.  The medical records show petitioner suffered a moderate course of GBS.  The severity of petitioner's injury, and the duration of his suffering, as compared to more severe cases of flu GBS, weigh against petitioner's request.  And while petitioner lives alone and thus spent much of his time during his acute illness isolated, including the hours on the floor when he fell on January 18, he also refused several treatment opportunities.  A few days after he visited Piedmont on January 18, 2017, RN Josie Homas called petitioner advising him to return to the emergency department for treatment and evaluation, but petitioner stated he was okay and would return if he was worse.  Pet. Ex. 7 at 1013-14.  Additionally, on April 3, 2017, petitioner requested discharged from Amedisys, "as he no longer needs Home Health."  Pet. Ex. 5 at 96.

The undersigned also finds that the evidence does not support petitioner's claim for future pain and suffering.  As petitioner points out in his brief, the medical records have shown significant improvement since 2017.  Pet. Brief at 9.  Based on petitioner's testimony, he has returned to baseline in terms of mobility and the ability to care for himself.  At the time of the hearing, petitioner testified that he his limitations in caring for himself have been reduced to intricate work.  While he has trouble with fine motor skill tasks, such as buttoning a shirt or tying a tie, he can still accomplish those tasks with some difficulty.  He did not testify to any residual pain and provided no medical evidence, such as a physician opinion, that he will have future pain or limitations as a result of his GBS.

## VII.   CONCLUSION

In light of all of the above, the undersigned awards the following compensation:

(1) **A lump sum payment in the amount of $180,000.00, representing actual pain and suffering and emotional distress, in the form of a check payable to petitioner, Charles Presley.**

(2) **A lump sum payment in the amount of $49,812.78, representing compensation for satisfaction of the State of Georgia Medicaid lien for services rendered on behalf of petitioner, Charles Presley, in the form of a check payable jointly to petitioner and:**

   **Georgia Department of Community Health**
   **900 Circle 75 Pkwy SE, Suite 650**

**Atlanta, GA 30339**

This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master